Filed 8/27/14

<u>CERTIFIED FOR PARTIAL PUBLICATION</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>LAWRENCE GRAY,<br><br>    Defendant and Appellant. | F065957<br><br>(Super. Ct. No. VCF149623)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Tulare County. Edward M. Lacy, Jr., Judge. (Retired Judge of the Stanislaus Sup. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)

Rudy Kraft, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans, Louis M. Vasquez, Rebecca L. Whitfield, Leanne Le Mon, and Lewis A. Martinez, Deputy Attorneys General, for Plaintiff and Respondent.

---

* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, only the Introduction, Procedural History, part II of the Discussion, and the Disposition are certified for publication.

-ooOoo-

## INTRODUCTION

Appellant Lawrence Gray challenges his commitment as a sexually violent predator (SVP). In the published portion of this opinion, we hold that the version of the Sexually Violent Predators Act (SVPA; Welf. & Inst. Code, § 6600 et seq.) under which appellant was committed is constitutional.[1] We decline to address changes to the SVPA that did not go into effect until after the date of appellant's commitment. In the unpublished portion of this opinion, we conclude appellant is not entitled to reversal based on admission of evidence concerning his HIV and hepatitis C status. We affirm the judgment.

## PROCEDURAL HISTORY

Appellant was born in 1966. On August 26, 2005, he pled guilty to assault with intent to commit oral copulation, in the commission of which he used a knife (Pen. Code, §§ 220, 12022, subd. (b)(1)), and assault with a deadly weapon and by means of force likely to produce great bodily injury (*id*., § 245, subd. (a)(1)), and admitted having served a prior prison term (*id*., § 667.5, subd. (b)). He was sentenced to five years in prison.

On August 23, 2010, the Tulare County District Attorney filed a petition to commit appellant under the SVPA. On August 22, 2011, the trial court found probable cause to believe appellant was an SVP. On September 19, 2012, following a jury trial, appellant was found to be an SVP. That same day, he was committed to the Department of State Hospitals (DSH) for an indeterminate term. (§ 6604.)[2]

---

[1]    Further statutory references are to the Welfare and Institutions Code unless otherwise stated.

[2]    DSH was formerly known as the Department of Mental Health (DMH).

2.

# FACTS[*]

## I

### PEOPLE'S EVIDENCE

*Aaron M.*

On July 14, 2005, Aaron M., then age 15, was walking down a street in Tulare when he encountered appellant, a stranger. Aaron asked if appellant had a cigarette. Appellant asked Aaron to go to the gas station with him, as there would be a man there who would orally copulate Aaron and pay Aaron money. When Aaron refused, appellant pulled out a small pocketknife, put it toward Aaron's back, walked Aaron to some bushes, and told Aaron to sit in them. Aaron obeyed, and appellant then instructed him to pull his penis out of his pants. Appellant said he wanted to suck it. When Aaron refused, appellant again demanded that he pull out his penis.

An ambulance went by with its siren blaring. Appellant turned to look, and Aaron reached for the knife. The two wrestled for it; the knife cut Aaron's hand. Aaron got appellant in a headlock and threw the knife through a nearby fence. Appellant apologized and said he did not mean to do that, whereupon Aaron threatened to beat him, and then ran down the street to his house. Once there, he told his mother what had happened and she called the police.

*Dr. Craig Teofilo*

Dr. Craig Teofilo, a licensed psychologist, with extensive experience and expertise in working with sex offenders and in conducting SVP evaluations, was asked by the DMH to evaluate appellant. Teofilo received and reviewed: the abstract of judgment listing the conviction and sentence; the probation officer's report detailing the crime, criminal record, and personal background; and police investigation reports. Teofilo also

---

[*]    See footnote, *ante*, page 1.

3.

reviewed appellant's prison records, as well as his "rap sheet." He then interviewed appellant for almost three and a half hours.

Teofilo's SVP evaluation analysis focused on the three criterion for commitment as an SVP: (1) whether appellant had committed an offense that qualified under the SVPA, meaning an offense that was sexual in nature and had elements of violence; (2) whether appellant had a diagnosed mental disorder that specifically predisposed him to commit sexual crimes; and (3) whether appellant was likely to reoffend in a violent predatory criminal manner. Teofilo explained that "a diagnosed mental disorder" was defined as a congenital or acquired condition affecting the emotional or volitional capacity that predisposes a person to the commission of criminal sexual acts in a degree constituting the person a menace to the health and safety of others. Diagnoses are contained in the Diagnostic and Statistical Manual of Mental Disorders (DSM, with the current version referred to as the DSM-IV-TR), although the SVPA does not specifically require a diagnosis from the DSM. He clarified that "likely" means the person represents a serious and well-founded risk.

Teofilo found appellant to meet the first criterion. The records Teofilo reviewed showed appellant was in prison for sexually assaulting a male in 2005, when appellant was 39 years old. It was Teofilo's understanding that appellant came upon the victim (whose age Teofilo did not know) on the streets. Appellant told the victim that if he wanted to go down to a different corner, someone would pay the victim to suck the victim's penis. When the victim refused, appellant pulled out a knife, put it to the victim's back, escorted him to some bushes near a freeway where appellant had an encampment, took him into the bushes, covered the bushes with some mattresses so they could not be seen from the street, and told the victim to take out his penis so appellant could orally copulate him. The victim complied, and, as appellant went down onto his knees, the victim put him into a choke hold and they started fighting. The victim got the knife, threw it away, and fled. Appellant was convicted of violating Penal Code

4.

section 220, assault with intent to commit oral copulation. The conviction constituted a qualifying offense under the SVPA.

The records also showed that in 1998, when appellant was 32 years old, he sexually assaulted a 15-year-old boy. Appellant and the victim had gone to a convenience store, where appellant bought the victim some cigars. On the way back, appellant wanted to get high smoking crack. He went into an abandoned house and smoked, while the victim waited outside. Appellant then had the victim come into the house. Appellant grabbed the victim, pulled off the victim's clothing, covered his mouth so he could not scream for help, and attempted to sodomize the victim. Because the victim struggled, appellant was unable to achieve penetration, so he attempted to orally copulate the victim. The victim continued to struggle, and appellant stopped the assault. The victim got dressed and they left. Appellant held the victim's arm, controlling the victim's movement, all the way back to the victim's residence. Appellant was convicted of violating Penal Code section 288, subdivision (c), lewd and lascivious act on a child 15 years of age. This was also a qualifying offense under the SVPA.

Teofilo also found appellant to meet the second criterion, he had a mental disorder that predisposed him specifically to commit a sex crime. Based on Teofilo's review of records and on his interview with appellant, he diagnosed appellant with: antisocial personality disorder, with borderline features; two substance-related disorders, cocaine dependence and alcohol abuse; and with sexual disorder, not otherwise specified (NOS), sexual compulsivity.

The diagnosis of antisocial personality disorder was based on 13 pieces of data: (1) appellant had five arrests between the ages of 11 and 14, resulting in a Youth Authority commitment;[3] (2) appellant admitted that, beginning around age 10, he

---

[3]     Teofilo acknowledged that people who suffer from antisocial personality disorder generally are criminals, and antisocial personality disorder can be diagnosed in a person with no sexual offenses in his or her history. However, he found it notable that appellant

burglarized 20 to 25 homes, making friends first so that he could case the houses ahead of time; (3) appellant admitted having set 10 to 15 houses or structures on fire; (4) at age 13, appellant was arrested for carrying a loaded .357 magnum to school; (5) appellant admitted being a bully at school, and said he fought perhaps one time a week and loved fighting; (6) appellant frequently argued with teachers, physically assaulted two teachers during his schooling, and was suspended and expelled; (7) appellant had 10 separate arrests as an adult that included sex offenses, drugs, and weapons; (8) appellant had five parole violations and both of his sex offenses occurred while he was on probation, indicating he was not complying with community supervision; (9) appellant had 19 rule violation reports in prison, six of which were for violence; (10) appellant admitted making money through illegal means, by stealing and selling drugs, with this representing about 30 percent of his income between ages 25 and 39; (11) appellant admitted acting, between ages 25 and 39, as a pimp to about 200 women, although he said he "never made it a habit"; (12) appellant admitted cashing bad checks for friends; and (13) appellant was described, in his medical chart, as being "med seeking," meaning he was looking for medication, and there was a concern he was selling his medication to other inmates.

Teofilo also used the "Robert Hare psychopathy test" to determine whether appellant had characteristics consistent with a psychopath or sociopath.[4] A psychopath is likable and manipulative, can be quite forceful, is not affected or motivated by guilt or shame, tends not to experience anxiety in the way most people do, and does not form strong attachments or relationships with people. Appellant's score on the checklist

had a sex offense as a juvenile. Research has shown that most juveniles who commit sexual crimes do not go on to reoffend as adults. Appellant did not suffer from antisocial personality disorder at age 14; he did, however, suffer from conduct disorder, the precursor to antisocial personality disorder.

[4]      Teofilo explained that psychopathy is an extreme form of antisocial personality disorder.

exceeded the cut-off at which someone can be said to have a psychopathic personality, indicating he had a lot of characteristics similar to those characterized as psychopaths. Research suggests a psychopath designation has strong relationship with criminal recidivism, including violent crime. There is also "some evidence that supports its relationship with future sexual offending."

As for the borderline features to the antisocial personality disorder diagnosis, Teofilo explained that borderline personality disorder "has to do with a … pervasive pattern of unstable self-image [and] impulsivity." In Teofilo's opinion, appellant did not meet "the full threshold" for borderline personality disorder, but had some characteristics of it.

Teofilo considered appellant's relationship and sexual histories in arriving at his opinion appellant had antisocial personality disorder. Appellant recounted that he was homosexual, had never married, and had never lived with a romantic partner, and so had never been able to develop and maintain a long-term romantic relationship with someone in the community. He also related that his first recollection of a sexual encounter was at age nine and involved mutual genital fondling with a neighbor boy the same age. At age 10, he orally copulated his male cousin. Appellant estimated having had 1,000 sexual partners, 600 of which were one-night stands. There was a period of time, while he was in prison, when he would masturbate five times a day. Also while he was in prison, there was a period of time when he had sex with another inmate five times a day, although this decreased to once a day.[5] Appellant's sexual partner in prison was his cellmate; appellant let this person urinate on him and tie him up. Appellant related that he loved to "mess around" with married men when he was in the community, and said it was "a high" for him. He also related he had two children with his brother's girlfriend; the

---

[5]     Sex inside prison is against prison policy.

7.

brother thought he, not appellant, was the father. Teofilo concluded appellant was "very sexually preoccupied."

Teofilo asked appellant about the crimes he committed when he was 14.**[6]** Appellant related the conduct involved sex play with a student peer in the bathroom; they entered the bathroom together, put their penises between each other's legs, and fondled each other. When other boys came into the bathroom, they quickly separated. Appellant said he was accused of rape when the other boy's mother found out. Contrary to appellant's version of events, documentation indicated there were four different victims. Three were brothers, ages five, six, and eight, who were neighbors of appellant. The child at school was 12. Appellant was first charged with molesting two of the brothers, then with sexually assaulting the 12-year-old. Ultimately, he was found to have molested the eight-year-old brother and to have sexually assaulted the 12-year-old boy in the bathroom. All the brothers told the police that appellant made them orally copulate him and sodomized them. The eight-year-old said appellant threw rocks at the eight-year-old and the five-year-old to separate them from the six-year-old. When the eight-year-old saw appellant again, appellant was naked and on top of the younger brother. With respect to the school incident, the 12-year-old said appellant twisted his arm behind his back and punched him in the stomach, then pulled down his pants. Appellant exposed his own penis and had simulated sex with the boy "from behind." Appellant threatened to beat him up if he told anyone.

The diagnosis of substance-related disorder, both cocaine dependence and alcohol abuse, was based on appellant's admissions regarding his historical use of both substances. Although appellant admitted trying several drugs, he labeled crack cocaine

---

**[6]** In 1980, when appellant was 14, he was found to have violated Penal Code section 288, subdivision (a), a lewd act on a child, and Penal Code section 288a, subdivision (b)(1), oral copulation on a person under the age of 18. These offenses resulted in a Youth Authority commitment.

his "drug of choice." Teofilo deemed appellant in remission, however, because he was in a controlled environment.

The diagnosis of sexual disorder, not otherwise specified (NOS), sexual compulsivity, was based on appellant's history. Teofilo stated there were elements of appellant's sexuality that were "highly compulsive"; he had "a really profound sexual preoccupation." Teofilo believed that having 1,000 different partners, of whom 600 were strangers, having group sex 25 to 35 times, cross dressing, the frequency of masturbation, and the frequency of sex while in custody, were all components that indicated the presence of a sexual disorder. Teofilo did not, however, diagnose appellant with paraphilia. Paraphilia is a sexual deviance, like sexual interest in children or nonconsenting people or nonhuman objects.

Finally, Teofilo found appellant met the third criterion; he was likely to engage in sexually violent predatory criminal behavior. Teofilo explained that someone could have a mental disorder that predisposed him or her to commit sex crimes, but, if he or she was not likely to reoffend in the future, that person did not meet the criteria for being an SVP; appellant, however, was likely to reoffend. Teofilo used three different measures to assess appellant's risk of committing future sexual crimes: the Static 99-R risk assessment, which measures "static factors" — factors that do not change, and the SVR-20 and the SRA-FV, both of which look at "dynamic factors" — such as substance abuse or a sexual preoccupation — which can be changed and addressed in treatment.

The Static 99-R, a 10-item instrument is, according to Teofilo, the "gold standard in sex offender evaluation and treatment," it is "the best there is at predicting, but it only is a moderate predictor."[7] Teofilo scored appellant as a seven during the first evaluation

---

**7**    The Static 99-R does not say whether a specific individual will reoffend. Rather, it says that a group of people with the same score as the individual have gone on to reoffend at a particular rate.

done in 2010, then, after receiving further information about appellant's criminal record, rescored him as a nine. A score of six or higher is considered high risk.

Teofilo also utilized instruments in his evaluation that considered dynamic factors. Taking all the factors and instrument scores together, Teofilo determined appellant was similar to the high risk, high needs group. Groups of individuals from that group with a score of nine reoffended at a rate of around 52.4 percent in five years, and 61.9 percent in 10 years. Because not all sex criminals are arrested or convicted, Teofilo believed the numbers were an underestimation.

In addition, Teofilo opined that appellant needed to be treated in a secure facility. With respect to treatment, appellant told Teofilo he participated in phase one treatment at Coalinga State Hospital, but did not start phase two. Teofilo confirmed appellant in fact completed phase one of Coalinga's five-phase program. Phase one was tantamount to pretreatment, and was not sex-offender-specific. Appellant did not begin phase two, which was sex-offender-specific. Appellant said he would not do phase two because he would be made to sign a treatment contract. Appellant told Teofilo, "I am not signing a contract to nobody. That's like making a deal with Satan."

Teofilo spoke to appellant about appellant's plans if he were to be released. Appellant said he was going to go to AA groups, join a drug program, go home and take care of his mother, get a job, and go back to church. He made no mention of having to abide by conditions of parole or participate in treatment.

Teofilo explained, that in assessing risk of reoffending, there are three main factors considered to be protective, meaning they make someone less likely to reoffend. The first is having lived in the community for 10 or more years with no new sex offense. This shows the person has some capacity to control impulses. The second is age and physical health. Older offenders and those who are infirm (for example, someone with late-stage cancer) are not as likely to commit a sex offense. The third is having

completed — not just started — a sex-offender-specific treatment program. Appellant had none of those protective factors.

Appellant's belief he had not committed a sex offense and did not need sex offender treatment; the fact appellant declined to participate in sex offender treatment when made available to him at Coalinga State Hospital; and the fact appellant had five parole violations and committed two sex offenses while on probation, suggested appellant did not perform well while on community supervision and so, Teofilo concluded, would be a risk to the community.

*Appellant*

Appellant testified he was 46 years old at the time of trial. When he was 13, he put his "thing" between someone's legs. It was consensual. He never attempted penetration. He did not hit the person in the stomach or threaten him. He did not have sex with any of the neighbor children or hit them with a rock.

The 1998 incident involved someone named Richard. Appellant was on probation or parole at the time. He was drinking and doing drugs with some people that day. Although Richard went with appellant to the store, appellant did not do anything sexual with him. As for the incident with Aaron M., appellant was on his way to the house of a married friend with whom he had "messed around" for about two years. Aaron approached and asked for a cigarette. Appellant gave him one. Aaron then asked if appellant knew where he could get some heroin. Appellant said he did not do heroin, only cocaine. Aaron asked if appellant had any. Appellant said yes. Aaron asked if he could have some, but appellant said he did not give his drugs away. Aaron then took appellant to the bushes, and Aaron showed appellant "his thing." Appellant did not put a knife to Aaron's back and did not know Aaron was only 15. Had appellant known, he would not have given Aaron drugs or gone into the bushes with him. Appellant pled guilty because he was offered a good deal.

11.

Appellant did not think he had a problem with regard to sex. He admitted having around 1,000 sex partners, but did not believe there was a problem unless a person was underage. He did not know Aaron was underage. If appellant was released, he would sign up for treatment, because when he was under the influence of alcohol and drugs, he had made wrong decisions. He was not still having drug issues, however. Appellant was on his way to getting into a program at Coalinga State Hospital that dealt with sex, when he was sent to the Fresno County Jail. He did not enter a program when he was first sent to the hospital because he was angry at the time. He refused to get into any of the classes because he was supposed to go home, not to a state hospital. He did go to phase one of a five-phase program, but did not go farther because he refused to go to classes that had contracts. If a person joined those classes and decided he wanted to leave because he did not agree with them, he would not be allowed to leave.

Appellant admitted getting into a lot of trouble when he was in prison. Sometimes it was because he did not want to be roommates with certain individuals, but the authorities refused to move him. Sometimes it was because he got in arguments with staff. Out in the community, he could walk away from a lot of things. In prison, he did not have that option.

Appellant explained that he chose not to be paroled when he was most recently eligible, and instead did his entire five-year sentence. He met and fell in love with someone in prison, and did not want to leave him at that time. To stay in prison, he got disciplinary write-ups for getting tattoos and sometimes for fights. None were for sexual conduct. After his 1998 offense, he also did his full time. This was because he kept getting into arguments with staff, and the disciplinary write-ups resulted in time credits being taken from him. Appellant had been at Coalinga State Hospital for the last two years. He had received disciplinary sanctions there, as well. They were for fights.

12.

## *Dr. Dale Arnold*

Dr. Dale Arnold, a licensed psychologist, with extensive experience and expertise in sex offender evaluation and treatment, and extensive experience in conducting SVP evaluations, was asked by the DMH to conduct an SVP evaluation on appellant. Arnold reviewed various documents, including appellant's criminal history, and, on August 17, 2010, he interviewed appellant.

Arnold spoke with appellant about appellant's sexual history. Appellant related that he became knowledgeable of sexual issues when he was about 10 years old. He first engaged in intercourse when he was around 12. He said he was convicted of a juvenile sexual offense when he was 14, although he said it involved consensual sexual contact with someone in the bathroom at school. Appellant told Arnold he had had well over 1,000 partners, and was extremely sexually preoccupied. Appellant said he and one of his partners in confinement would have sex as many as five times a day. When they were not having sex that often, appellant would masturbate when he was by himself. Appellant never had a committed relationship when he was in the community, but instead had lots of casual sex with individuals who may or may not have been married or openly homosexual. Appellant said this could happen with two or three men in the same day. He described himself as walking down the street and having people approach him for sexual contact. Sometimes he would agree to it in exchange for cocaine. Appellant saw no problem with it; it was something he enjoyed, and he was not distressed about the frequency or shallowness of his sexual contacts.

Arnold found appellant had been convicted of two sexually violent offenses. With respect to the 1998 offense, appellant denied committing any offense. He claimed the victim "made up the crime" in an effort to keep some money that was found in an eyeglass case. According to what appellant told the probation officer, however, he saw the victim having sexual contact with another individual. Appellant fondled the boy's penis and tried to initiate sexual contact, but denied using any force. Appellant told the

13.

probation officer he did it because he was high, and that had he not been using cocaine, he would not have committed the offense.

Arnold did a comprehensive review of appellant's records and examined his mental status. He also used the Hare psychopathy test. He diagnosed appellant with antisocial personality disorder and with cocaine dependence in remission in a controlled environment. Regarding the diagnosis of antisocial personality disorder, Arnold explained that 40 to 80 percent of inmates could be diagnosed with antisocial personality disorder, but psychopathy is a higher level of antisocial personality disorder, and appellant scored in the severe range on the Hare test. Such a score correlates to a rate of recidivism, although it is "a complicated relationship." Arnold explained that antisocial personality disorder is a chronic disorder that often "remits in the middle years of life," usually in the person's 40's. In individuals with psychopathy, however, the disorder tends to be a much more chronic condition. Individuals rated in the severe range tend to demonstrate antisocial personality traits and behaviors far longer than individuals not so rated, and may be chronically antisocial into their 50's or 60's. Antisocial personality disorder is a diagnosed mental disorder for purposes of the SVPA.

Regarding the issue of the likelihood of reoffending in a sexually violent predatory manner, Arnold explained that not all sex offenders pose the same level of risk. Risk assessment tools, "structured instruments," are used to determine the likelihood of reoffending. Certain factors are associated with people who reoffend; those factors were used in the instruments. Those with higher scores on such instruments tended to reoffend more often and more quickly than those with low scores. In addition, dynamic risk factors — external factors that are not completely accounted for in the instruments — are considered in forming an opinion as to the degree of risk.

In assessing appellant's risk, Arnold started with the Static 99 instrument. Initially, Arnold gave appellant a score of eight. After obtaining more detailed information about appellant's juvenile adjudications, however, he gave appellant a score

of nine. People who receive a score of six or above are in the high risk category. Appellant's cumulative percentile rating was in the 99th percentile, meaning if there were 100 sex offenders in the room, 99 of them would have gotten lower scores than appellant. In Arnold's opinion, it was most accurate to compare appellant to the "high risk high need sample type." Compared to that sample type, of those individuals who received a score of eight, 45 percent were charged or convicted of a new sex crime after five years in the community. After 10 years, 55 percent were charged or convicted of a new sex crime. In Arnold's opinion, this actually underestimated the risk of reoffending, because not all sex offenses are reported to the police or result in arrests or charges. Arnold also used the Static 2002 Revised. Appellant still received a score of nine, but for different reasons compared to the Static 99. In addition, Arnold performed testing with respect to dynamic risk factors.

Based on his evaluation of appellant and his risk assessment, Arnold opined appellant, if released, was likely to reoffend in a sexually violent predatory manner.

Arnold also believed it was necessary to keep appellant in a custodial setting for treatment purposes. He believed it was highly unlikely appellant would voluntarily participate in treatment on his own in the community, or even be able to cooperate with parole supervision in the community. Arnold found it "absolutely necessary" that appellant both remain in custody and receive treatment in order to reduce his risk of reoffending.

## II

### DEFENSE EVIDENCE

*Dr. Allen Frances*

Dr. Allen Frances, a medical doctor who was board certified in psychiatry, was the chair of the task force that created the DSM, and coauthor of the DSM-IV. He also wrote

15.

the final draft of the section of the DSM-III concerning antisocial personality disorder. He has lectured and written articles concerning SVP laws.[8] In the present case, he was retained to evaluate Teofilo's and Arnold's diagnoses of appellant. He did not interview appellant.

Frances found Teofilo's and Arnold's diagnoses of antisocial personality disorder to "make[] good sense." However, he found it "an open question" whether that disorder was a qualifying mental disorder under the SVPA. He explained that until recently in California, the intent was to use paraphilia NOS as the main diagnosis in SVP cases. That diagnosis having been somewhat discredited, there was now an attempt to use antisocial personality disorder as the qualifying diagnosis, even though it was not considered an appropriate qualifying diagnosis by the state evaluators or the DMH. Frances did not object to use of the diagnosis, as it was in the DSM and he believed it was within the jury's and legal system's right to use it, although his personal belief was that it did not make sense. He also believed paraphilia NOS was a "silly" diagnosis.

Frances explained that the purpose of the SVPA was to distinguish between simple criminality and mental disorder. People with mental disorders can be civilly detained against their will; people without mental disorders — even if criminals — cannot be. Most people who are convicted of sex offenses do not have a mental illness. Thus, the purpose of the diagnosis of mental disorder in the SVPA is to separate or narrow the large group of criminals who cannot be committed from the special few who have mental disorders and can be committed. It is those few sex offenders with a mental disorder who have a higher risk of reoffending in a sexually violent predatory manner.

According to Frances, antisocial personality disorder is "very common" among prisoners, with 50 to 90 percent of those in prisons or jails meeting the criteria therefor.

---

[8]    Although Francis had evaluated SVP evaluators, he had never performed an actual SVP evaluation.

Frances's main objection to the diagnosis in SVP cases is that it does not distinguish criminals from people with mental disorders. Antisocial personality disorder is not something that can be treated, other than with time. People grow out of it — become much less antisocial — as they get older. Extended psychotherapy is "a complete waste of time" where antisocial personality disorder is concerned. Accordingly, hospitalizing someone for it "[m]akes no sense."

Frances read Teofilo's and Arnold's reports concerning the number of appellant's sexual partners. In Frances's opinion, having 1,000 such partners does not constitute a mental disorder. Neither does sex addiction, and in fact, there is no diagnosis in the DSM for compulsive sexuality. Compulsive sexuality is "an incompetent diagnosis in a forensic case," and a psychologist who would offer such a diagnosis as an expert opinion should not be taken seriously. A diagnosis of sexual disorder NOS is "silly" because, although it is found in the DSM, compulsive sexuality is not. The "NOS" category is in the DSM so clinicians seeing patients have the freedom to use their own judgment in deciding whether someone has a diagnosis. No two raters will ever agree on an NOS diagnosis because there are no criteria. Such diagnoses have no forensic standing because they are inherently unreliable.[9] Moreover, compulsive sexuality has been considered for inclusion in the DSM, but rejected.

In Frances's opinion, it is a crime, but not a mental disorder, to have sex with teenagers. Similarly, it would be a crime for a 14-year-old to have sex with young children. Unless the person had a long-standing pattern of preferring young children and could be a diagnosed pedophile, however, a couple of actions by a teenager would not constitute a mental disorder.

---

[9]     Frances explained that the standards of diagnosis are radically different for a clinician as opposed to a person testifying in court.

Frances related that until recently, DMH instructed its evaluators that SVP cases required a diagnosis of paraphilia, and that antisocial personality disorder was not considered a qualifying diagnosis. In September 2011, DMH cautioned evaluators to not be careless in making a diagnosis of paraphilia, and advised them to consider other possible diagnoses if they could not diagnose paraphilia.

Frances did not consider himself an expert on prediction of reoffense or risk assessment. He felt the best predictor of what crimes a person might commit in the future would be the most recent crimes. If someone had 15 arrests and only three were for sex offenses, it was likely his or her next crime would not be a sex offense. Taking into account appellant's rules violations in prison and most recent parole violation, which was for a nonsexual assault, Frances believed the odds were that appellant's immediate future might involve more assaults that had nothing to do with sex.

## DISCUSSION

## I[*]

### ADMISSION OF EVIDENCE CONCERNING APPELLANT'S HIV AND HEPATITIS C STATUS

Appellant contends the trial court erred by permitting the prosecutor to present irrelevant and highly prejudicial evidence concerning appellant's HIV and hepatitis C status. He says the trial court's ruling in this regard violated both California's evidentiary rules and appellant's federal and state constitutional rights to due process and a fair trial. We find no cause for reversal.

### A. Background

During the hearing on in limine motions, the following occurred:

"[DEFENSE COUNSEL]: Your Honor, I had one other issue, and that is my client's HIV and hepatitis status. I don't think that is relevant. I think it would be highly prejudicial for the jury to learn of his HIV and hepatitis status, and I ask there be no mention of that.

---

[*]     See footnote, *ante*, page 1.

18.

"[PROSECUTOR]: Your Honor, part of the finding in SVP is the dangerousness of the defendant, and the defendant being in the condition that he is poses a greater danger than -- than he would otherwise.

"I believe that his condition goes to the legality [*sic*] of his possible reoffending. In that regard, it's relevant and ask that it be admitted.

"[DEFENSE COUNSEL]: I don't think it's dangerousness is an issue, your Honor. It's his likelihood to reoffend in a sexually violent predatory manner and whether he is likely to reoffend in a sexually violent and predatory manner has nothing to do with his HIV or hepatitis status. [¶] … [¶]

"THE COURT: I'm gonna [*sic*] … deny [defense counsel's] request. I've looked at [CALCRIM No.] 3454. [¶] … [¶]

"As a result of that diagnosed mental disorder he is a danger to the health and safety of others because it is likely he will engage in sexually violent predatory criminal behavior, and the disease can be transmitted by HIV or hepatitis the court feels is relevant to the danger to the health."

During the course of his testimony, Teofilo talked about his finding appellant had a "profound sexual preoccupation …." Teofilo noted appellant had contracted multiple sexually transmitted diseases, and had experienced a lot of negative side effects and distress from his sexual behavior. Over appellant's continuing relevance objection, the prosecutor elicited that one of those diseases was HIV, the virus that causes AIDS, and that appellant told Teofilo he contracted it from his partner in prison.

Arnold testified in part concerning so-called protective factors, which are factors that lower a person's future risk of reoffending. One of those factors was health issues. When the prosecutor asked if Arnold found anything with regard to appellant's health condition that increased his risk of danger to the community, Arnold testified, over defense counsel's relevance objections, that appellant was hepatitis C positive and HIV positive. Arnold stated: "For those reasons, I think the danger that he poses is substantially higher than your typical sex offending, because it's not only if he reoffends, but it's the chance that another person could be given a life threatening disease if he

19.

reoffends. So those two things combined, in my opinion, make him extremely dangerous."

Pursuant to CALCRIM No. 3454, the jury was subsequently instructed that, in order to prove the allegation appellant was an SVP, the People had to prove beyond a reasonable doubt:

"One, he has been convicted of committing sexually violent offenses against one or more victims;

"Two, he has a diagnosed mental disorder;

"And three, as a result of that diagnosed mental disorder, he is a danger to the health and safety of others because it is likely that he will engage in sexually violent predatory criminal behavior."

In his opening argument to the jury, the prosecutor asserted the consequences of appellant's actions did not deter him, his lack of control predisposed him to commit a sexually violent crime, and his predisposition to commit sexually violent acts made him a danger to the community. The prosecutor further argued the People had to prove that as a result of the mental disorder, appellant was a danger to the health and safety of others; that it was likely appellant would engage in sexually violent predatory behavior. The prosecutor noted "likely" was defined by the jury instruction as meaning a substantial, serious, and well-founded risk the person would reoffend. The prosecutor argued "[i]t is a serious risk when you have a sex offender who's kind of like a loose can[n]on walking on the streets."

In her argument to the jury, defense counsel observed that her role in the courtroom was to ensure her client received a fair trial. In part, she argued that a fair trial was one in which only relevant evidence was admitted, and she defined relevance for the jury. She stated:

"A fair trial, ladies and gentlemen, is not one that excites the prejudices and the emotions of the jurors. What is the purpose of eliciting testimony about my client's HIV status or the fact that he has hepatitis C?

20.

What element does that go to prove here?  According to [Dr.] Arnold, that makes … him even more dangerous because if he were to commit another sexual offense in the future, then the party that he offended against could contract HIV or hepatitis C.

"What is it about his HIV or hepatitis C status that makes it more likely that he will engage in a sexually violent predatory criminal act? Nothing at all.

"The only reason, the only purpose that that testimony has at this trial is to prejudice you against [appellant], and it is highly prejudicial information."

In his closing comments, the prosecutor argued appellant's "antisocial personality disorder pushes that sexual compulsion, his hypersexuality, and makes him likely to reoffend in a sexually violent predatory manner, that's what we are saying."  The prosecutor subsequently noted he did not bring up the subject of HIV, but it did go to appellant's dangerousness.  Defense counsel objected saying the prosecutor raised the subject in his direct examination of his experts.  The prosecutor responded that he did not mention it in his argument.  When the court told the prosecutor he could continue, the prosecutor stated:  "Is he a danger to health and safety?  Now that she brings it up, it is, you know."

**B.    Analysis**

The rules concerning the admission of evidence are settled.  "'"Only relevant evidence is admissible [citations], and, except as otherwise provided by statute, all relevant evidence is admissible [citations]."  [Citation.]  "Relevant evidence is defined in Evidence Code section 210 as evidence 'having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action.'  The test of relevance is whether the evidence tends 'logically, naturally, and by reasonable inference' to establish material facts such as identity, intent, or motive.  [Citations.]" [Citation.]'"  (*People v. Tully* (2012) 54 Cal.4th 952, 1010.)

"'[T]he trial court has broad discretion to determine the relevance of evidence.' [Citation.]" (*People v. Tully*, *supra*, 54 Cal.4th at p. 1010.) "[D]iscretion is abused whenever the court exceeds the bounds of reason, all of the circumstances being considered. [Citations.]" (*People v. Giminez* (1975) 14 Cal.3d 68, 72.)

"This discretion extends to evidentiary rulings made pursuant to Evidence Code section 352. [Citation.]" (*People v. Tully*, *supra*, 54 Cal.4th at p. 1010.) That statute provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." "… Evidence Code section 352 requires the exclusion of evidence only when its probative value is *substantially* outweighed by its prejudicial effect." (*People v. Tran* (2011) 51 Cal.4th 1040, 1047.) "'The prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence.… "The 'prejudice' referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying [Evidence Code] section 352, 'prejudicial' is not synonymous with 'damaging.'" [Citation.]' [Citation.]" (*People v. Lopez* (2013) 56 Cal.4th 1028, 1059.) Stated another way, "'[e]vidence is substantially more prejudicial than probative … [only] if … it poses an intolerable "risk to the fairness of the proceedings or the reliability of the outcome" [citation].' [Citation.]" (*People v. Tran*, *supra*, 51 Cal.4th at p. 1047.)

The SVPA defines an SVP as "a person who has been convicted of a sexually violent offense against one or more victims and who has a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior." (§ 6600, subd. (a)(1).) "[L]ikely" in this context means the person presents "a substantial danger, that is, a serious and well-

founded risk, of committing such crimes if released from custody." (*People v. Roberge* (2003) 29 Cal.4th 979, 988, italics omitted.) A diagnosed mental disorder "includes a congenital or acquired condition affecting the emotional or volitional capacity that predisposes the person to the commission of criminal sexual acts in a degree constituting the person a menace to the health and safety of others." (§ 6600, subd. (c).) A finding the person is dangerously disordered is not enough; there must also be "a volitional impairment rendering [the person] dangerous beyond [his or her] control." (*Kansas v. Hendricks* (1997) 521 U.S. 346, 358; see *Hubbart v. Superior Court* (1999) 19 Cal.4th 1138, 1157-1158.) In other words, there must be proof the person has "serious difficulty in controlling" his or her dangerous behavior. (*Kansas v. Crane* (2002) 534 U.S. 407, 413; accord, *People v. Williams* (2003) 31 Cal.4th 757, 759.)

The trial court and prosecutor appear to have misunderstood the criteria for an SVP finding, as set out in CALCRIM No. 3454. The issue before the jury was not whether appellant was dangerous because of the potential consequences to his victim(s) if he reoffended, but whether he was dangerous because it was likely he would reoffend in a sexually violent predatory manner.

Appellant's HIV/hepatitis C status was not wholly irrelevant, however. As the People now argue, Teofilo relied in part on this information in forming his opinion appellant was sexually preoccupied and suffered from sexual compulsivity. The evidence was relevant on this point: It showed appellant engaged in repeated sexual activity despite the consequences, which in turn had some tendency in reason to support Teofilo's diagnosis. Although the People did not argue this theory of relevance in the trial court, "[i]f a judgment rests on admissible evidence it will not be reversed because the trial court admitted that evidence upon a different theory, a mistaken theory, or one not raised below. [Citations.]" (*People v. Brown* (2004) 33 Cal.4th 892, 901.) "'""[A] ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for a wrong reason. If right upon any theory of the law applicable to the case, it must be

23.

sustained regardless of the considerations which may have moved the trial court to its conclusion.' [Citation.]" [Citation.]' [Citation.]" (*People v. Smithey* (1999) 20 Cal.4th 936, 972.) "[W]hether evidence was erroneously admitted does not depend on counsel's later argument to the jury." (*People v. Harrison* (2005) 35 Cal.4th 208, 230.)

Appellant says, however, that even if his HIV/hepatitis C status had some probative value, it should have been excluded under Evidence Code section 352. He also says the trial court failed to engage in the mandatory weighing process under that statute. (See *People v. Prince* (2007) 40 Cal.4th 1179, 1237.)

"[A] party may not complain of the erroneous admission of evidence unless '[t]here appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion ….'" (*People v. Richardson* (2008) 43 Cal.4th 959, 1001, quoting Evid. Code, § 353, subd. (a).) In accord with Evidence Code section 353, subdivision (a), the California Supreme Court has """"consistently held that the "defendant's failure to make a timely and specific objection" on the ground asserted on appeal makes that ground not cognizable."""" [Citation.]" (*People v. Tully*, *supra*, 54 Cal.4th at p. 1010.)

We do not believe appellant's Evidence Code section 352 claim has been preserved for appellate review. Although defense counsel made a single reference to the evidence being "highly prejudicial," "counsel neither mentioned Evidence Code section 352 nor argued that the probative value of the evidence was substantially outweighed by a risk of undue prejudice. Instead, counsel argued consistently and exclusively that the evidence was entirely irrelevant …. This was insufficient to preserve a claim of error under Evidence Code section 352. [Citations.]" (*People v. Kipp* (2001) 26 Cal.4th 1100, 1124.)

In any event, any error in admitting the evidence — whether because it was irrelevant to the issue of dangerousness or because it was substantially more prejudicial than probative under Evidence Code section 352 — was harmless, even if we assume the

prosecutor's argument, which was in accord with the trial court's reasoning in admitting the evidence, invited the jury to use the evidence for an improper purpose. "[T]he erroneous admission … of evidence does not require reversal except where the error … caused a miscarriage of justice. [Citations.]" (*People v. Richardson*, *supra*, 43 Cal.4th at p. 1001; Evid. Code, § 353, subd. (b).) "[A] 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836; see, e.g., *People v. Benavides* (2005) 35 Cal.4th 69, 91.)

Evidence appellant presented a substantial danger (a serious and well-founded risk) of reoffending in a sexually violent predatory manner was overwhelming — indeed, virtually uncontradicted. (Compare *People v. Paniagua* (2012) 209 Cal.App.4th 499, 520.) Evidence of appellant's HIV and hepatitis C status was no more inflammatory than evidence concerning appellant's prior misdeeds and sexual activities. (See *People v. Ewoldt* (1994) 7 Cal.4th 380, 405.) It is simply not reasonably probable the jury would have found appellant to not be an SVP had evidence concerning his HIV/hepatitis C status been excluded. (See *People v. Benavides*, *supra*, 35 Cal.4th at p. 91; *People v. Whitson* (1998) 17 Cal.4th 229, 251.)[10]

In the introductory paragraph to this claim of error in his opening brief, appellant says the error violated not only California's evidentiary rules, but also his due process

---

[10] In light of this conclusion, we need not address, at length, appellant's assertion he received ineffective assistance of counsel if his Evidence Code section 352 claim was not adequately preserved. To prove ineffective assistance of counsel, appellant must show both deficient performance and prejudice, i.e., that there is a reasonable probability he would have obtained a more favorable result absent counsel's shortcomings. (*People v. Cunningham* (2001) 25 Cal.4th 926, 1003; see generally *Strickland v. Washington* (1984) 466 U.S. 668, 687-694.) Appellant has failed to establish prejudice; hence, we need not decide whether trial counsel's performance was deficient. (See *In re Fields* (1990) 51 Cal.3d 1063, 1079.)

right to a fair trial under the federal and state Constitutions. He does not mention the point further. Although appellant's failure to object on constitutional grounds in the trial court is not, under the circumstances, fatal to his assertion of such a claim on appeal (*People v. Zamudio* (2008) 43 Cal.4th 327, 353; *People v. Partida* (2005) 37 Cal.4th 428, 435), appellant's presentation of the matter is. "'Where a point is merely asserted by counsel without any argument of or authority for its proposition, it is deemed to be without foundation and requires no discussion.'" (*People v. Dougherty* (1982) 138 Cal.App.3d 278, 282; see *People v. Hardy* (1992) 2 Cal.4th 86, 150; *People v. Wharton* (1991) 53 Cal.3d 522, 563.) Accordingly, we decline to discuss appellant's due process claim.[11]

## II

### CONSTITUTIONALITY OF SVPA

Appellant contends the version of the SVPA under which he received an indeterminate commitment violates the ex post facto and double jeopardy provisions of the federal and state Constitutions, as well as his rights to due process and equal protection of law. He concedes the California Supreme Court has ruled against him on his due process, ex post facto, and double jeopardy claims. (*People v. McKee* (2010) 47 Cal.4th 1172 (*McKee I*).) We are thus required to reject these assertions. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)[12] He further concedes that upon remand in *McKee I*, the Court of Appeal in *People v. McKee* (2012) 207

---

[11]    We would not find a constitutional violation in any event.

[12]    In reality, although *McKee I* rejected the due process and ex post facto arguments made by appellant (*McKee I*, *supra*, 47 Cal.4th at pp. 1193, 1195), the case did not directly address a claim the SVPA violates double jeopardy principles. It did, however, find the SVPA not punitive. (*McKee I*, at p. 1195; see *Hubbart v. Superior Court*, *supra*, 19 Cal.4th at p. 1175.) In light of this determination, we agree with those cases that have rejected double jeopardy contentions. (E.g., *People v. McDonald* (2013) 214 Cal.App.4th 1367, 1383; *People v. Landau* (2013) 214 Cal.App.4th 1, 44-45.)

Cal.App.4th 1325 (*McKee II*) ruled against his position on the equal protection issue. He says, however, that *McKee II* was wrongly decided and so should not be followed.

In *McKee I*, the California Supreme Court observed that under the SVPA, as amended by Proposition 83 ("The Sexual Predator Punishment and Control Act: Jessica's Law") effective November 8, 2006 (the version under which appellant was committed), SVP's receive indeterminate commitments and, generally speaking, bear the burden of proving they should be released, while mentally disordered offenders (MDO's) are committed for one year and thereafter have the right to be released unless the People prove beyond a reasonable doubt that the person should be recommitted for another year. (*McKee I*, *supra*, 47 Cal.4th at pp. 1186-1187, 1202.) The Supreme Court found that SVP's and MDO's are similarly situated for purposes of determining whether equal protection is violated by the fact one class bears a substantially greater burden in obtaining release from commitment than the other. (*Id*. at p. 1203.) The court stated: "Because MDO's and SVP's have the same interest at stake — the loss of liberty through involuntary civil commitment — it must be the case that when society varies the standard and burden of proof for SVP's in the manner in which Proposition 83 did, it does so because of the belief that the risks involved with erroneously freeing SVP's from their commitment are significantly greater than the risks involved with freeing MDO's. [Citation.] A substantial question is raised about the basis for this belief." (*Id*. at p. 1204, fn. omitted.) The court did not hold, as a matter of law, that there was no justification for the different treatment, but rather remanded the matter to give the People the opportunity to demonstrate a constitutional justification for the disparate treatment of SVP's and MDO's. (*Id*. at pp. 1207-1209.) It emphasized "that different classes of individuals civilly committed need not be treated identically" (*id*. at p. 1210), and that "mere disagreement among experts will not suffice to overturn the Proposition 83 amendments. The trial court must determine whether the legislative distinctions in classes of persons

subject to civil commitment are reasonable and factually based — not whether they are incontrovertible or uncontroversial" (*id.* at pp. 1210-1211).

Upon remand, the trial court held a 21-day evidentiary hearing and concluded the People had met their burden of justifying the disparate treatment of SVP's. (*McKee II*, *supra*, 207 Cal.App.4th at p. 1330.) Division One of the Fourth District Court of Appeal affirmed, concluding "the trial court correctly found the People presented substantial evidence to support a reasonable perception by the electorate that SVP's present a substantially greater danger to society than do MDO's .…" (*Id.* at pp. 1330-1331.)

The appellate court set out the strict scrutiny standard applicable, observed that the trial court employed that standard in holding the evidentiary hearing, and noted that the trial court, in its 35-page statement of decision, found the People had met their burden of establishing, by a preponderance of the evidence, that the disparate treatment of SVP's was based on a reasonable perception they posed greater and unique dangers. (*McKee II*, *supra*, 207 Cal.App.4th at pp. 1332, 1335.) It then explained:

> "McKee asserts, and we agree, that we review de novo the trial court's determination whether the [SVPA], as amended by Proposition 83, violates his equal protection rights. We independently determine whether the People presented substantial, factual evidence to support a reasonable perception that SVP's pose a unique and/or greater danger to society than do MDO's …, thereby justifying the disparate treatment of SVP's under the [SVPA]. Although the trial court heard the testimony of many witnesses and received in evidence many exhibits, the instant constitutional question involved mixed questions of law and fact that are predominantly legal, if not purely legal questions, which are subject to de novo review. [Citations.] Furthermore, because in this case the trial court presumably did not decide any disputed historical facts, but determined only whether the People presented sufficient evidence to support a reasonable perception that SVP's pose a greater danger to society, we are in as good a position as the trial court to make that determination. Therefore, we apply an independent standard in reviewing the trial court's order rejecting McKee's equal protection claim.
>
> "In independently reviewing the evidence admitted at the remand hearing, we must determine whether the People presented substantial

28.

evidence to support a reasonable inference or perception that the [SVPA's] disparate treatment of SVP's is necessary to further compelling state interests. [Citations.] … '[W]hen a constitutional right, such as the right to liberty from involuntary confinement, is at stake, the usual judicial deference to legislative findings gives way to an exercise of independent judgment on the facts to ascertain whether the legislative body "'has drawn *reasonable inferences based on substantial evidence*.'"' (*McKee* [*I*, *supra*, 47 Cal.4th] at p. 1206, italics added.) For evidence to be 'substantial,' it cannot be just 'any' evidence, but must be of ponderable legal significance, reasonable, credible, and of solid value. [Citation.] Furthermore, our power begins and ends with the determination whether there is substantial evidence, contradicted or uncontradicted, to support the legislative determination, and when two or more inferences can reasonably be deduced from the evidence, we are without power to substitute our deductions for those of the electorate or other legislative body. [Citation.]" (*McKee II*, *supra*, 207 Cal.App.4th at pp. 1338-1339, fn. omitted.)

The Court of Appeal found the People had presented evidence (1) "showing the inherent nature of the SVP's mental disorder makes recidivism significantly more likely for SVP's as a class than for MDO's" (*McKee II*, *supra*, 207 Cal.App.4th at p. 1340); (2) "that the victims of sex offenses suffer unique and, in general, greater trauma than victims of nonsex offenses" (*id*. at p. 1342); and (3) "showing SVP's are significantly different from MDO's … diagnostically and in treatment" (*id.* at p. 1344).

The appellate court also rejected the defendant's argument the SVPA was unconstitutional unless it adopted the least restrictive means available to further the state's compelling interests. (*McKee II*, *supra*, 207 Cal.App.4th at pp. 1348-1349.) The court reviewed the pertinent authorities — including *McKee I* — and concluded: "[I]n strict scrutiny cases, the government must show both a compelling state interest justifying the disparate treatment *and* that the disparate treatment is necessary to further that compelling state interest. [Citations.] We are unpersuaded the electorate that passed Proposition 83 in 2006 was required to adopt the least restrictive means available (e.g., a two-year or other determinate term of civil commitment) in disparately treating SVP's and furthering the compelling state interests of public safety and humane treatment of the mentally disordered." (*McKee II*, at p. 1349.)

29.

The California Supreme Court denied review of *McKee II* on October 10, 2012 (S204503).

Appellant now says *McKee II* was wrongly decided because (1) the *McKee II* court only addressed the problem arising out of the indeterminate commitment and did not address the equal protection issues arising out of the shifting of the burden of proof in section 6608 petitions, as well as the lack of a right to a jury trial in such proceedings; (2) the *McKee II* court failed to properly apply strict scrutiny in its analysis; (3) the *McKee II* court's factual analysis was "badly flawed"; and (4) the *McKee II* court never explained how disparate treatment was necessary to serve the compelling governmental interests of protecting society and providing treatment to mentally ill sex offenders. Appellant urges us to conduct our own analysis of the law, and either rule the SVPA violated appellant's equal protection rights or remand the matter for an evidentiary hearing on the issue.

Every published opinion to consider the issue has concluded the applicable version of the SVPA passes constitutional muster under the strict scrutiny test, and has found *McKee II* persuasive. (*People v. Kisling* (2014) 223 Cal.App.4th 544, 547-548 [Third Dist. Court of Appeal][13]; *People v. McDonald*, *supra*, 214 Cal.App.4th at pp. 1371, 1376-1382 [Fourth Dist. Court of Appeal, Div. 3][14]; *People v. Landau*, *supra*, 214 Cal.App.4th at pp. 47-48 [Fourth Dist. Court of Appeal, Div. 3]; *People v. McCloud*

---

[13] *Kisling* expressly found that to not follow *McKee II* would be contrary to the California Supreme Court's "clear intent" in remanding *McKee I* to the trial court for an evidentiary hearing. (*People v. Kisling*, *supra*, 223 Cal.App.4th at p. 548.)

[14] *McDonald* expressly found the equal protection challenge was to be resolved on a classwide basis, rather than affording each potential SVP the right to present his or her own evidence on the matter. (*People v. McDonald*, *supra*, 214 Cal.App.4th at pp. 1377-1378.) The court further rejected the arguments that the Court of Appeal in *McKee II* failed to conduct the required de novo review (*People v. McDonald*, at pp. 1378-1379), did not apply a true strict scrutiny standard (*id*. at pp. 1379-1380), and incorrectly assessed the evidence (*id*. at pp. 1380-1382).

(2013) 213 Cal.App.4th 1076, 1078-1079, 1085-1086 [First Dist. Court of Appeal, Div. 2]; *People v. McKnight* (2012) 212 Cal.App.4th 860, 862-864 [First Dist. Court of Appeal, Div. 3].) We agree with these opinions. We recognize we are not bound to follow *McKee II*.[15] Nevertheless, we reject appellant's claim his federal and state equal protection rights were violated by the version of the SVPA pursuant to which he was committed.

Appellant seeks to have us consider recent amendments to the SVPA, which, he claims, cause the law now to violate his due process rights under *McKee I*'s analysis, and require that we either reverse his indeterminate commitment or find the amendments unconstitutional.[16] We decline to do so. We are concerned with the constitutionality of the SVPA as it existed when appellant was adjudged an SVP, not the statutory scheme as it may or may not be applied to appellant in the future. (Cf. *People v. Carroll* (2007) 158 Cal.App.4th 503, 508, fn. 2.)[17]

---

[15] In arguing this point in his opening brief, appellate counsel notes a conclusion reached by this court in an unpublished opinion. It is improper to cite or rely upon unpublished opinions except in limited circumstances not present here. (Cal. Rules of Court, rule 8.1115(a) & (b).)

[16] Senate Bill No. 295 (2013-2014 Reg. Sess.) added section 6604.9 and amended sections 6605 and 6608, all of which concern conditional release and/or unconditional discharge.

[17] We are not persuaded by appellant's argument the issue is ripe for review because of the reliance placed by *McKee I* on the availability of relief under section 6608 as it then stood. The fact remains appellant was adjudged an SVP before Senate Bill No. 295's amendments took effect. Those amendments may or may not be applied to appellant in the future.

## **DISPOSITION**

The judgment (order of commitment) is affirmed.

_____
DETJEN, J.

WE CONCUR:

_____
GOMES, Acting P. J.

_____
KANE, J.